UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re:<br><br>LINDSAY LAMPASONA, LLC,<br><br>       Debtor. | Chapter 11<br><br>Case No. 11-19747-JNF |
| LINDSAY LAMPASONA, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>J. DERENZO CO.,<br><br>       Defendant. | Adv. Proc. No. 12- |

## COMPLAINT

Lindsay Lampasona, LLC (the "Debtor"), the debtor and debtor-in-possession in the above captioned case, brings this action for estoppels, breach of contract and violations of Massachusetts General Laws Chapter 93A, and in support of this complaint avers as follows:

### THE PARTIES

1. Lindsay Lampasona, LLC is a Delaware limited liability company that is the debtor and debtor-in-possession in the above captioned bankruptcy proceeding.

2. J. Derenzo Co. ("Derenzo") is a Massachusetts for profit corporation with a principal place of business at 338 Howard Street, Brockton, Massachusetts.

### JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334.

1

4. Venue in this district is proper pursuant to 28 U.S.C. § 1409(a). This case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

5. This Court has personal jurisdiction over Derenzo pursuant to Bankruptcy Rule 7004(f) and because Derenzo is a Massachusetts corporation.

### FACTUAL BACKGROUND

6. On October 14, 2011 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code.

7. The Debtor was in the business of constructing concrete foundations and walls, specializing in tilt-up concrete wall systems and formwork/flatwork foundations and floors, including laser screed floors and "F" number specified flat and superflat concrete floors.

8. In 2010, the downturn in the construction industry caused by the global economic downturn caused a decline in the pricing of jobs in the Debtor's industry, and the Debtor experienced financial problems.

9. In 2011, when it became apparent that the Debtor could no longer sustain profitable operations, the Debtor began exploring a sale of its operations as a going concern. The Debtor continued to work to finish all of its construction projects, but experienced difficulty locating a buyer because it did not have a sufficient backlog of work to profitably sustain its ongoing operations.

10. Prior to the Petition Date, the Debtor received an offer, from Rykor Concrete & Civil, Inc. ("Rykor"), for the purchase of the Debtor's tangible assets and the right to complete the Debtor's contract on its primary remaining construction project located in Merrimack, New Hampshire (the "MPO Project"). The alternative to the sale to Rykor was a forced liquidation, which would result in a lower price for the Debtor's tangible assets and a longer sale period, the

loss of the employees' jobs, an increase in the claims of the Debtor's creditors arising from the hard stop of work on ongoing construction sites, and the loss of most, if not all, of its accounts receivable due to backcharges and setoff and recoupment claims from general contractors.

### A. The Sale Motion.

11.     On the Petition Date, the Debtor's intended to utilize the offer from Rykor to provide for the completion of the MPO Project and the sale of the Debtor's tangible assets in an orderly fashion. On October 19, 2011, the Debtor filed the *Debtor's Motion (A) to Authorize Debtor to Effectuate Purchase and Sale Agreement with Rykor Concrete & Civil Inc.; (B) to Authorize Sale of Assets by Private Sale Free and Clear of Liens, Claims and Interests; (C) to Authorize the Assumption and Assignment of Executory Contracts, and (D) for Related Relief*, which was subsequently amended by order of this Court on November 22, 2011 (the "Sale Motion"), pursuant to which the Debtor proposed, among other things, to sell substantially all of its tangible assets to Rykor and to assign the Debtor's contract on the MPO Project (the "MPO Contract") to Rykor.

12.     As of the Petition Date, the MPO Contract had two distinct portions of work, the construction of foundations (the "Foundation Work"), which was ongoing on the Petition Date, and so-called "Hardscape Work", which was not scheduled to commence until the spring of 2012. As of the Petition Date, it was likely that the Debtor would not be able to complete the Hardscape Work. The assignment of the MPO Contract to Rykor would have resolved this issue since Rykor was able and prepared to perform the Hardscape Work.

13.     Derenzo opposed the assignment of the MPO Contract to Rykor, and filed an objection to the Debtor's proposed bid procedures relating to the Sale Motion.

14. The Debtor was able to re-negotiate the terms of the sale with Rykor such that the assignment of the MPO Contract was removed from the asset purchase agreement without any reduction in the sale price. A motion to amend the Sale Motion was filed on November 16, 2011, and an order approving the amended sale to Rykor was entered on December 30, 2011.

### B. The Cash Collateral Motion.

15. The Debtor filed a motion to use cash collateral (the "Cash Collateral Motion") seeking to use cash collateral primarily for the purpose of completing the MPO Project. Because the Debtor was uncertain whether it could obtain amounts that were due from Derenzo under the MPO Contract, the Cash Collateral Motion requested the authority to obtain funding for the MPO Project, including funding for the Debtor's subcontractors and suppliers, from Rykor.

16. Derenzo filed a limited objection to the Cash Collateral Motion (the "Derenzo Cash Collateral Objection"). Derenzo did not object to the use of cash collateral to complete the MPO Project or to pay subcontractors and suppliers on the MPO Project. Instead, Derenzo's objection was to the manner of payment of the subcontractors and suppliers, seeking to insure that, among other things, payments were made by joint check and in exchange for lien releases and waivers.

17. Derenzo, the Debtor and the Bank of Canton ("Canton") were able to agree to the form of an order for the use of cash collateral that provided for the Debtor to continue to work on the MPO Project. Derenzo, the Debtor and Canton subsequently agreed to a total of seven (7) cash collateral orders that permitted the Debtor to complete the Foundation Work on schedule and within the contract price.

18.    As of the filing of this complaint, no party, including Derenzo, the general contractor on the MPO Project or the owner of the MPO Project, has asserted that there is any current defect or issue with the Foundation Work.

19.    As of the completion of the Foundation Work, the Debtor is owed approximately $110,000 under the MPO Contract *after* the payment of all subcontractors, suppliers and laborers and exclusive of Derenzo's claims against the Debtor.

C.    **The Hardscape Work.**

20.    Since Rykor was no longer assuming the MPO Contract, it was necessary to locate a replacement subcontractor to perform the Hardscape Work.

21.    Derenzo obtained a bid of approximately $1,319,500 for the Hardscape Work from S&S Concrete Floors, Inc.

22.    The Debtor obtained a bid of approximately $950,034 for the Hardscape Work from JET Concrete, LLC ("JET"). The Debtor forwarded the JET bid to Derenzo.

23.    Derenzo scheduled a meeting with JET with respect to the JET Bid. The Debtor requested that it be permitted to participate in the meeting between JET and Derenzo. Derenzo refused to let the Debtor participate in its meeting with JET.

24.    Following Derenzo's meeting with JET, JET submitted a revised bid for the Hardscape Work (the "Revised JET Bid"). Although the Revised JET Bid had the same contract price, it was substantially less favorable to the Debtor's bankruptcy estate because, among other things, it excluded: (a) the layout of the Hardscape Work (item 5 on the Revised Jet Bid), (b) grading (item 6 on the Revised Jet Bid), and (c) a warranty for the Foundation Work (item 14 on the Revised Jet Bid), all of which had been included in the JET Bid. It is unusual for a concrete company not to perform the layout and grading work associated with pouring concrete.

5

25. Derenzo subsequently agreed to split the Hardscape Work between JET and Rykor and negotiated contracts with JET and Rykor for the Hardscape Work (collectively the "Hardscape Contracts"). As a result of Derenzo's negotiations, which, again, the Debtor was not permitted to participate in, the contract prices to be paid to JET and Rykor under the Hardscape Contracts were increased to an aggregate of approximately $1,037,656 without any material change in the work to be performed.

26. Derenzo has asserted that it holds claims against the Debtor under the MPO Contract for work that Derenzo claims it had to perform including: (a) approximately $90,000 associated with the layout of the Hardscape Work, (b) approximately $96,000 for grading, and (c) $50,000 for the warranty of the Foundation Work. All of the foregoing were excluded from the Revised JET Bid following Derenzo's meeting with JET.

27. As a result of its asserted claims against the Debtor, Derenzo alleges that there is not enough money remaining under the MPO Contract to pay all of the parties who provided the goods, services and labor to complete the Foundation Work.

## COUNT I – ESTOPPEL

28. The Debtor repeats and realleges each and every allegation contained in paragraphs 1 through 27 above as though fully set forth herein.

29. Derenzo agreed to the Debtor's use of cash collateral to complete the Foundation Work knowing that the Debtor was incurring debts to subcontractors, suppliers and laborers and knowing that, as a result of the requisition process and the "pay when paid" provisions of the MPO Contract, payments under the MPO Contract usually took approximately sixty (60) days to process.

30. The Debtor did in fact incur obligations to its subcontractors, suppliers and laborers to complete the Foundation Work on time and under budget.

31. Based on its claims against the Debtor, Derenzo alleges that there is not enough money remaining under the MPO Contract to pay all of the subcontracts, suppliers and laborers who provided good and services to complete Foundation Work.

32. By obtaining the completion of the Foundation Work and the Hardscape Work on time and within the contract price, Derenzo derived a substantial benefit from the work done by the Debtor and from the labor, goods and other services provided by the Debtor's subcontractors, suppliers and laborers.

33. It would be unjust to permit Derenzo to refuse to remit the amounts due to the Debtor under the MPO Contract to the Debtor's subcontractors, suppliers and laborers, including without limitation Rykor, for the labor, goods and services they provided to the Debtor to complete the Foundation Work.

34. Derenzo is estopped from refusing to remit the amounts due to the Debtor under the MPO Contract to the Debtor's subcontractors, suppliers and laborers, including without limitation Rykor, for the labor, goods and services they provided to the Debtor to complete the Foundation Work.

## COUNT II – BREACH OF CONTRACT

35. The Debtor repeats and realleges each and every allegation contained in paragraphs 1 through 24 above as though fully set forth herein.

36. The Debtor and Derenzo are parties to the MPO Contract, as modified. The MPO Contract, as modified, is a valid contract under applicable state law.

37. The Debtor has substantially completed its obligations under the MPO Contract.

38. Derenzo has refused to pay amounts due to the Debtor under the MPO Contract and has stated that will not pay future amounts due to the Debtor under the MPO Contract as they come due.

39. Derenzo has breached the MPO Contract, as modified.

40. The Debtor has suffered damages as a result of such breach including, without limitation, the inability to pay the amounts due to the laborers, subcontractors and suppliers who provided goods and services to the Debtor to complete the MPO Contract, as modified.

### COUNT III – VIOLATION OF M.G.L. C. 93A

41. The Debtor repeats and realleges each and every allegation contained in paragraphs 1 through 40 above as though fully set forth herein.

42. The Debtor and Derenzo are each "persons" engaged in trade and commerce within the meaning of Mass. Gen. Laws c. 93A.

43. Derenzo's acts and conduct, as described in the preceding paragraphs, constitute unfair and deceptive acts and practices, in the conduct of trade or commerce, in violation of Mass. Gen. Laws c. 93A §§ 2 and 11.

44. Derenzo's acts and practices were knowing and willful violations of Mass. Gen. Laws c. 93A §§ 2 and 11.

45. Derenzo's acts and practices were wanton and reckless and in violation of Mass. Gen. Laws c. 93A §§ 2 and 11.

46. Derenzo's wrongful acts occurred primarily and substantially within the Commonwealth of Massachusetts.

47. As a consequence of Derenzo's wrongful acts and conduct, the Debtor has suffered the loss of valuable business sales and customers and is entitled to multiple damages relating thereto, plus interest, costs, and attorneys' fees.

**WHEREFORE**, the Debtor respectfully requests that this Court enter judgment for the Debtor and against Derenzo: (a) estopping Derenzo from refusing to remit the amounts due to the Debtor under the MPO Contract to the Debtor's subcontractors, suppliers and laborers, including without limitation Rykor, for the labor, goods and services they provided to the Debtor to complete the Foundation Work, (b) for breach of the MPO Contract and for the Debtor's damages arising from that breach, (c) for violation of M.G..L. c. 93A and for damages, including treble damages, for such violation, (d) awarding the Debtor, and directing Derenzo to pay, the Debtors' costs and expenses incurred in this suit, including professional fees, and (e) granting to the Debtor such other and further relief as this Court may deem necessary and proper in the circumstances.

Respectfully submitted,

LINDSAY LAMPASONA, LLC,

By its counsel,

/s/ D. Ethan Jeffery
D. Ethan Jeffery (BBO #631941)
Natalie B. Sawyer (BBO #660072)
MURPHY & KING P.C.
One Beacon Street, 21st Floor
Boston, MA  02108-3107
Telephone:  (617) 423-0400
Facsimile:  (617) 423-0498
dej@murphyking.com

Dated: May 18, 2012
626331